# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MORALES, Minors.

UNPUBLISHED
March 23, 2017

Nos. 334131; 334142
Midland Circuit Court
Family Division
LC No. 14-004353-NA

Before: BECKERING, P.J., and O'CONNELL and BORRELLO, JJ.

PER CURIAM.

In these consolidated appeals, respondent-mother (Docket No. 334131) and respondent-father (Docket No. 334142) each appeal as of right the trial court's order terminating their parental rights to their minor children, JAM, AMM, CDM, ALM, AM, and AFM, pursuant to MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (j). For the reasons set forth in this opinion, we affirm.

## A. BACKGROUND

The initial petition, filed on May 1, 2014, alleged that respondents abandoned the children with a neighbor, that respondent-mother refused drug testing and had a substance-abuse issue, and that respondent-father punched respondent-mother in the face and kicked her on April 25, 2014. Respondent-father was subsequently arrested on domestic violence charges, and respondent-mother was arrested for outstanding warrants. The allegations concerning March 17, 2014, also indicated that the children did not have any clothing and that the home was "trashed." The petition also recounted respondents' history with petitioner, which included prior drug use, drug sales, and domestic violence committed by both respondents, beginning in 2008, and reoccurring in 2011 and 2014. Following a hearing on May 1, 2014, the trial court authorized the petition, took custody of the children, and placed the children with their maternal grandmother and their paternal grandmother.

After accepting pleas from respondents, the court took jurisdiction over the children and a case service plan was adopted. Review hearings were held on November 24, 2014, February 17, 2015, April 28, 2015, and July 28, 2015.

At the November 24, 2014 hearing, caseworker Todd Borders testified that respondent-mother was doing well and participating in services. At the April 28, 2015 review hearing, caseworker Ryan Hageness testified that respondent-father, who was not at the hearing, had not had any contact with DHHS since February 2015. Respondent-mother, who had apparently made respondent-father leave the home, also had not had recent contact with him. Respondent-

-1-

mother had obtained housing and petitioner anticipated returning the children to her care. At the July 28, 2015 hearing, which respondent-father did not attend, Hageness testified that respondent-father had not contacted DHHS for more than six months. Hageness stated that all of the children had been returned to respondent-mother.

A show cause hearing and review hearing was held on October 30, 2015. Neither respondent was present. Hageness testified that respondent-mother had reunited with a former boyfriend, and that he had engaged in sending threatening text messages to respondent-mother, had slashed all four of her tires on multiple occasions, had shattered her windshield, and had keyed obscenities into the side of her car. While respondent-mother had obtained a personal protection order against him, she also continued to have contact with him. She was also pregnant with his child, her eighth child. Hageness planned, and respondent-mother agreed, that respondent-mother and the children should move in with the maternal grandmother in Saginaw. Respondent-mother had also started new employment, but she did not have transportation because she had not been able to have her tires fixed. She also continued to have a suspended license and owed a $550 fine for operating her vehicle with a suspended license. The trial court approved Hageness' plan and ordered another hearing in 45 days.

An expedited review hearing was held on November 3, 2015. Respondent-mother and the children were residing with the maternal grandmother in Saginaw. However, respondent-mother was not present at an emergency removal hearing on November 19, 2015. Foster care worker Amanda Smock testified that respondent-mother had contacted the boyfriend, and stayed with him for three days in violation of a no-contact order. She had three of the children with her. When Smock tried to contact respondent-mother, she texted Smock that she wanted her mother to take care of the children "until she can get things taken care of." The trial court agreed with Smock's recommendation to remove the children from respondent-mother's custody and place them with their maternal grandmother.

During a March 2, 2016 review hearing, respondent-mother was present, but respondent-father was not. After admitting the court report, the case service plan, and two additional reports by stipulation, the trial court indicated that at a pretrial conference all parties agreed that counsel for respondent-father could be excused from the proceedings. The court noted that no one had heard from respondent-father for more than a year. Petitioner's counsel indicated that the appropriate goal would be long-term foster care without termination. Placement with the maternal grandmother was no longer viable. Respondent-mother's attorney stated that respondent-mother had moved to Grand Rapids for a job opportunity and was working full time and was in counseling. She had obtained an apartment. The guardian ad litem noted that, while respondent-mother had stated that she could not have visitation with the children because she could not travel to Saginaw, she was having unauthorized visits with the children in Saginaw and she simply did not want to cooperate with anything petitioner wanted her to do. Respondent-mother was again pregnant with her ninth child; her boyfriend was the father of this child.

At a May 26, 2016 statutory review hearing, respondent-father began participating in the proceedings. The court admitted into evidence a report that showed that respondent-father failed four drug screens in April and May, 2016, and that respondent-father was now living with respondent-mother in a motel in Grand Rapids. Respondents were receiving services from Taylor Kinney, who worked for Samaritas, a private agency in Grand Rapids. Kinney stated that

she had gone to respondents' residence and found it unclean and not suitable for a child's safety and well-being. The trial court authorized the filing of a termination petition.

Petitioner filed a petition to terminate respondents' parental rights on June 10, 2016. Neither respondent was present at the termination hearing. At the hearing, Borders testified that he was the assigned caseworker from May 2014 through April 2015. Borders stated that respondent-father had initially been very active in assisting the DHHS, but then refused to participate in services. Borders stated that it was respondent-mother who attempted to have respondent-father participate and that his involvement was minimal at best. While he attended enough parenting classes to receive credit, he did not complete that service, and his post-score assessment for the class was lower than his pre-score assessment. Respondent-father participated at first in couples counseling, but then decreased his participation and he periodically refused to take drug tests. Respondent-mother separated from respondent-father in February 2015, after which respondent-father "abdicated services" and was not involved with petitioner. He became homeless, refused services, refused to take drug screens, and then was non-responsive to phone calls. After the second week of February 2015, Borders had no more contact with respondent-father. Borders observed "very little" of a bond between respondent-father and the children.

Borders testified that respondent-mother became more involved as the case continued. She took a psychological assessment, completed parenting classes, attended counseling and substance abuse services, gained employment in August 2014, and, by the time the case was transferred to another caseworker, she was on her way toward reunification. She did continue to rely on Suboxone to wean off her opiate addiction. Borders observed a bond between respondent-mother and the children; some children had a stronger bond with her than others.

Borders recommended termination of respondents' parental rights as being in the children's best interests "[b]ecause the pattern of behavior for both parents is historically continuing to relive itself" and their behavior was no different in 2016 than in 2014. He expressed disappointment that respondent-mother had reverted; she continued to be involved in unhealthy relationships with men who had demonstrated no ability to create stable housing for herself and the children, or make a budget or provide for their basic needs, and she had not visited them since December 2015, so she was not available for their emotional needs. He had met with JAM and CDM and the children had little interest in talking about respondents. However, the children had strong bonds with each other and their placement in separate homes if they could not see each other would be "absolutely harmful" for them.

Ann Hansen a caseworker with the Midland County Health and Human Services testified that she worked with respondent-mother to find housing and other services; she did not work with respondent-father because he would not meet with her. Respondent-mother was cooperative, but she would not follow through. With respect to housing, respondent-mother did not follow through with Hansen's attempts to have Midland Area Homes for Charity help her. Hansen negotiated a three-bedroom apartment for respondent-mother, but respondent-mother lost it because she failed to finish filling out the paperwork. Hansen did get respondent-mother into a two-bedroom apartment, with payment of three months' rent from various agencies. Hansen also obtained a van for respondent-mother. Hansen stopped working with respondent-mother at the end of May 2015, when the children were returned to respondent-mother's care.

Hageness testified that he was assigned to the case between April 2015 and early November 2015. Respondent-father did not participate in services during that time. Hageness was only able to make face-to-face contact with respondent-father twice. Hageness asked him to take drug screens; he refused, but admitted that he had been smoking marijuana. Later, respondent-father refused to see Hageness and blamed the state for taking the children.

Hageness testified that respondent-mother initially participated in services. Although respondent-mother was supposed to comply with a payment plan for $500 for the van, which was worth $8,000, she did not. Her boyfriend repeatedly vandalized the car and it ultimately became inoperable approximately six months after she received it. After petitioner helped respondent-mother obtain the apartment, Hageness received "many phone calls and e-mails" from the landlord that the neighbors had complained about parties going until 2:00 or 3:00 a.m. and that they smelled marijuana through the ventilation system. Hageness also stated that the boyfriend choked respondent-mother in the parking lot in front of the children. Although Hageness was able to convince respondent-mother to obtain a personal protection order against him in July 2015, respondent-mother was still seeing him and she would leave the children alone overnight or for a few days to visit him. Respondent-mother then became pregnant with her second child by her boyfriend, her ninth child overall. Hageness agreed that respondent-mother's pattern with abusive men had continued since the beginning of the case. Hageness also stated that respondent-mother made herself very difficult to contact. At approximately the same time that Hageness was able to place the children with their maternal grandmother, respondent-mother moved to Grand Rapids.

Hageness thought that termination of respondent-mother's parental rights was in the children's best interests because, during the time he had been the caseworker, respondent-mother exhibited an alarming pattern of behavior that served her own interests over those of the children, and frequently exposed the children to abusive individuals. He also stated that the children needed stability. Respondent-mother had shown that she did not want the responsibility of raising the children and Hageness did not think this would change any time soon. Respondent-mother also treated the children's maternal grandmother as a "built-in babysitter." Hageness stated that the bond the children had with each other was very strong.

Kerry Fischer testified that she was the caseworker from December 22, 2015, through May 24, 2016. She stated that the three youngest children, ALM, AM and AFM, were together in foster care placement and the parents were willing to consider adoption. The three older children, JAM, AMM, and CDM, were already or would be placed with their paternal aunt, who was willing to do a guardianship with the children. Fischer had requested a courtesy worker for respondents in Grand Rapids. Fischer stated that she repeatedly attempted to help respondent-mother visit the children, but respondent made repeated excuses about why she could not. Respondents were not participating in services. Fischer testified that it was in the children's best interest to terminate respondents' parental rights.

The trial court found that petitioner had presented clear and convincing evidence to establish grounds for termination under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (j) with respect to both respondents. The trial court noted that the initial conditions in the case involved substance abuse issues with both respondents, housing issues, improper care, and issues with leaving the children with improper caretakers, and that these conditions continued to exist. The court also

found that, given the lengthy history of the case and respondent-mother's actions, these would likely continue to exist. The trial court also found that other conditions existed under § 19b(3)(c)(*ii*), which respondents had not rectified despite a reasonable opportunity to do so. With respect to § 19b(3)(j), the trial court found that the children would likely be harmed if returned to respondents because "neither one of them seems to have an understanding of what the needs are of children, by way of protection, lack of use of substance abuse (sic), lack of involvement in domestic violence, housing, food, none of the basic necessities of life, let alone the emotional stability have been met by - - by these parents." The trial court also found that termination of respondents' parental rights was in the children's best interests.

## B. ANALYSIS

### I. STATUTORY GROUNDS

Both respondents argue that the trial court erred in finding that a statutory ground for termination was established by clear and convincing evidence. "In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). We review for clear error a trial court's ruling that a statutory ground for termination has been proven by clear and convincing evidence. *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *Id*.

The trial court found that grounds for termination were established with respect to both respondents, in part, under MCL 712A.19b(3)(c)(*i*), which provides:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

### A. RESPONDENT-MOTHER

The conditions that led to the children's adjudication concerned respondent-mother's absence from the home in March 2014, her substantial substance abuse problem, a lack of food in the home, non-payment of rent, and respondent-mother's arrest for outstanding warrants. The allegations concerning the events of March 17, 2014, also included that the children did not have appropriate clothing and that the home was "trashed." Other historical conditions included respondents' history with petitioner, which included prior drug use, drug sales, and domestic violence by both respondents against each other beginning in 2008, and reoccurring in 2011 and 2014.

Respondent-mother initially made good progress toward rectifying the conditions. She obtained a psychological evaluation, attended parenting classes and substance abuse classes, obtained employment, ended her abusive relationship with respondent-father, and obtained adequate housing. She still took Suboxone, but she had negative drug screens and progressed enough that the children were returned to her care. However, respondent-mother reverted to her destructive behavior that was harmful to herself and the children when she initiated an unhealthy relationship with her boyfriend. He was physically abusive and destroyed respondent-mother's vehicle and engaged in domestic violence in front of the children. Nevertheless, respondent-mother continued to see him and again became pregnant by him. While she and her boyfriend lived together in an apartment, they had numerous parties until early in the morning and used marijuana. At that point, respondent-mother resorted to again disappearing overnight or for a few days, abandoning the children and leaving them to fend for themselves. When respondent-mother moved to Grand Rapids, she essentially abandoned the children and resisted attempts by the caseworkers to foster visitation. With respect to housing, respondent-mother eventually moved back in with respondent-father, in a motel. The Grand Rapids caseworker stated that the premises was unclean and not suitable for the children's safety and well-being. Given this evidence, the trial court did not clearly err in finding that the conditions that led to the adjudication continued to exist. Further, considering that respondent-mother had had more than two years to rectify the conditions, the trial court did not clearly err in finding that the conditions were not reasonably likely to be rectified within a reasonable time. MCL 712A.19b(3)(c)(*i*). Given that there was one ground for termination, we need not address the other grounds relied on by the trial court. *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

## B. RESPONDENT-FATHER

The issues that led to the adjudication with respect to respondent-father included domestic violence and his abandonment of the children with a neighbor without providing legal authority to care for them. The trial court did not clearly err in finding that the conditions that led to termination continued to exist and would not be rectified within a reasonable amount of time. MCL 712A.19b(3)(c)(*i*).

At the time of the termination hearing, respondent-father had not participated in services or even visited the children for more than a year. He remained unavailable to the children for the greater part of the proceedings. Respondent-father's argument that the children were not left without proper custody because they remained in the court's care is without merit. They remained in the court's care because respondent-father was unable to provide proper care and custody. Although respondent-father had completed some services, he did not complete domestic violence classes or substance abuse treatment. In addition, the motel in which he and respondent-mother were living at the time of the termination hearing was dirty and not safe or suitable for children. The evidence clearly supports the trial court's finding that respondent-father failed to rectify the conditions that led to the adjudication, and was not reasonably likely to do so within a reasonable time given the children's ages. MCL 712A.19b(3)(c)(*i*). *In re Ellis*, 294 Mich App at 32.

## II. BEST INTERESTS

Both respondents argue that the trial court erred in finding that termination was in the children's best interests.

Under MCL 712A.19b(5), "[i]f the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." Whether termination of parental rights is in a child's best interests is determined by a preponderance of the evidence. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). We review for clear error a trial court's determination whether termination of parental rights is in a child's best interests. *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 63; 874 NW2d 205 (2015).

The trial court determined that termination was in each of the children's best interests. Before making findings as to each individual child, the court noted:

> The Court would also note that it is clearly in the best interest of these children that this - - that this termination as to both parents occur. The Court would rely significantly on the analysis of Mr. Hageness, who I - - I feel has a very good handle on, as well as the recommendation of the [GAL] . . . So as to each of the children, the Court would make the following findings, because there is the potential for relative placement, and so the Court will do an individual best interest evaluation.

The court proceeded to make findings as to each child individually, finding that termination was in each of the children's best interests. The court did not clearly err in doing so.

With respect to respondent-mother, respondent mother engaged in destructive behavior, and continually reverted into the lifestyle that gave rise to this proceeding. Specifically, respondent-mother became involved in abusive relationships, was involved with drugs, abandoned the children on more than one occasion, failed to adequately participate in services, failed to provide basic necessities or emotional support, and failed to create a stable home environment for the children. Respondent-mother was simply unable to acquire and maintain a stable home for the children, she repeatedly exposed the children to destructive behavior and violent individuals and was unable to rectify the conditions that led to this adjudication.

Respondent-mother was afforded every opportunity to overcome her difficulties, but her actions showed that she was not committed to her children, but rather as Hageness explained, respondent-mother served her own self-interests. For example, Ann Hansen, a caseworker, arranged so that respondent-mother could have a three-bedroom apartment, but respondent-mother failed to complete the paperwork to obtain the housing. Hansen then arranged for respondent-mother to have a two-bedroom apartment, but respondent-mother used the apartment to party into the early morning hours and there was marijuana smoke emanating from the ventilation system. In addition, respondent-mother became involved in an abusive relationship with her boyfriend who physically assaulted her in front of the children at the apartment. Similarly, Hansen secured an $8,000 van for respondent-mother for $500, but respondent-mother failed to adhere to the payment plan and became involved in a relationship with a man who vandalized the vehicle and rendered it inoperable merely six months after respondent-mother

-7-

received it. Respondent-mother continued to see the boyfriend even after his destructive and abusive behavior, displaying a lack of awareness that a parent needs to protect children from abusive individuals.

Moreover, respondent-mother repeatedly abandoned the children. She left the children overnight on more than one occasion so that she could visit her boyfriend and then she left the children with the maternal grandmother and moved to Grand Rapids. After moving to Grand Rapids, respondent-mother repeatedly made excuses as to why she was unable to visit the children and she stopped participating in services. By the time of the termination hearing, which respondent-mother did not attend, it was over seven months since respondent-mother visited with the children. Respondent-mother's lack of interest in the children showed that she was unfit to parent the children. She failed to provide for the children's basic needs and was not available for their emotional needs. Borders, Fischer and Hageness all testified that termination was in the children's best interests. Hageness accurately summarized respondent-mother's pattern of behavior as behavior that served her own self-interests over the children, exposed the children to abusive individuals, and exhibited a total lack of interest in assuming the responsibility of raising the children. Furthermore, the children needed stability as the proceeding had been ongoing for over two years and the children were doing well in placement and the court considered possible placement with relatives. In sum, the trial court did not clearly err in finding that termination of respondent mother's parental rights was in the best interests of all six children.[1]

Similarly, the trial court did not clearly err in finding that termination of respondent-father's parental rights was in the children's best interests. Respondent-father made less of an effort to rectify the conditions that led to the adjudication than respondent-mother did. Respondent-father's behavior exhibited a disregard of the best interests of the children and an unwillingness to accept the responsibilities of being a father. Respondent-father was not involved in the children's lives and he did not participate in services. Respondent-father repeatedly failed to take drug tests, stopped attending counseling and disappeared for nearly a year. In particular, respondent-father had no contact with the children from February 2015 through the July 15, 2016 termination hearing. Respondent-father refused services, had little to no contact with DHHS, had not completed anger management counseling or substance abuse treatment and was living in a place that was unfit for children. Respondent-father refused to accept responsibility for his actions and instead blamed the state for taking his children; he displayed a complete failure to accept the responsibilities that come with being a parent. Respondent-father engaged in a pattern of destructive behavior and made no progress from 2014 to 2016 and at the time of the termination hearing was still not participating in services. Both Borders and Fischer testified that it was in the children's best interests to terminate respondent-

---

[1] Respondent-mother argues that the court should have considered long-term foster care pursuant to MCL 712A.19a(7)(b). However, by their terms, MCL 712A.19a(6) and (7) both apply only after a permanency planning hearing, prior to the initiation of termination proceedings. Thus, these provisions did not limit the trial court's authority after the termination hearing. Rather, MCL 712A.19b(5) governed the trial court's decision after statutory grounds for termination had been proven and the court did not err in its best interests determination.

father's parental rights and the trial court made individual findings as to each of the children that it was in their best interests to terminate. The children needed stability and a safe and secure home and there was no evidence that respondent-father would meet the children's needs at any time in the near future. The trial court did not clearly err in finding that it was in the children's best interests to terminate respondent-father's parental rights. *In re Payne/Pumphrey/Fortson*, 311 Mich App at 63.

Respondent-father argues that the three older children JAM, AMM, CDM, could have been placed with their paternal aunt under a long-term care plan while still maintaining some relationship with respondents and the trial court erred in failing to take this into consideration while making its best interests determination. This argument lacks merit.

This Court held *In re Olive/Metts* that a trial court must consider and address a child's placement with relatives before terminating parental rights, stating:

> However, because "a child's placement with relatives weighs against termination under MCL 712A.19a(6)(a)," the fact that a child is living with relatives when the case proceeds to termination is a factor to be considered in determining whether termination is in the child's best interests. Although the trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests . . . the fact that the children are in the care of a relative at the time of the termination hearing is an explicit factor to consider in determining whether termination was in the children's best interests. A trial court's failure to explicitly address whether termination is appropriate in light of the children's placement with relatives renders the factual record inadequate to make a best-interest determination and requires reversal. [*In re Olive/Metts*, 297 Mich App at 43-44.]

In this case, the record supports that the trial court did consider the three older children's placement with a relative when determining that termination was in the children's best interests. Specifically, before making individual findings as to each of the three older children, the trial court stated:

> So as to each of the children, the Court would make the following findings, *because there is potential for relative placement*, and so the Court will do an individual best interest evaluation (emphasis added).

The trial court then proceeded to make individualized findings as to each of the children, finding that termination was in the children's best interests. By first acknowledging the potential of relative placement, all of the court's findings were made in the context of understanding that placement with a relative was a possibility. Thus, contrary to respondent-father's argument, the trial court did consider the older children's placement with a relative as required by *In re Olive/Metts*, 297 Mich App at 43-44. The court was clearly aware that the three older children were placed with their paternal aunt, yet based on all of the other facts and circumstances of the case determined that termination was in the children's best interests. As discussed above, the trial court did not clearly err in doing so. *Id.*

## III.  SEPARATE HEARINGS

Respondent-father argues that because termination of his parental rights was requested on the basis of both (1) the same circumstances that led the court to take jurisdiction, proof of which was not subject to the rules of evidence, MCR 3.977(H)(2), and (2) circumstances new or different from the offense that led the court to take jurisdiction, which were required to be proven by legally admissible evidence, MCR 3.977(F), the trial court was required to conduct separate termination hearings to determine whether the grounds for termination had been proven.

MCR 3.977(F)(1)(b) provides:

The court may take action on a supplemental petition that seeks to terminate the parental rights of a respondent over a child already within the jurisdiction of the court on the basis of one or more circumstances new or different from the offense that led the court to take jurisdiction.

(1) The court must order termination of the parental rights of a respondent, and must order that additional efforts for reunification of the child with the respondent must not be made, if

(a) the supplemental petition for termination of parental rights contains a request for termination;

(b) at the hearing on the supplemental petition, the court finds on the basis of clear and convincing legally admissible evidence that one or more of the facts alleged in the supplemental petition

(i) are true; and

(ii) come within MCL 712A.19b(3)(a), (b), (c)(ii), (d), (e), (f), (g), (i), (j), (k), (*l*), (m), or (n); and

(c) termination of parental rights is in the child's best interests.

MCR 3.977(H)(2) provides:

If the parental rights of a respondent over the child were not terminated pursuant to subrule (E) at the initial dispositional hearing or pursuant to subrule (F) at a hearing on a supplemental petition on the basis of different circumstances, and the child is within the jurisdiction of the court, the court must, if the child is in foster care, or may, if the child is not in foster care, following a dispositional review hearing under MCR 3.975, a progress review under MCR 3.974, or a permanency planning hearing under MCR 3.976, take action on a supplemental petition that seeks to terminate the parental rights of a respondent over the child on the basis of one or more grounds listed in MCL 712A.19b(3).

* * *

-10-

(2) *Evidence.* The Michigan Rules of Evidence do not apply, other than those with respect to privileges, except to the extent such privileges are abrogated by MCL 722.631. At the hearing all relevant and material evidence, including oral and written reports, may be received by the court and may be relied upon to the extent of its probative value. The parties must be afforded an opportunity to examine and controvert written reports received by the court and shall be allowed to cross-examine individuals who made the reports when those individuals are reasonably available.

Respondent-father argues that the court terminated his parental rights based on "different circumstances" when it terminated under MCL 712.19b(3)(c)(*ii*) and (j) and based on the "same circumstances" when it terminated under MCL 712A.19b(3)(c)(*i*). Therefore, according to respondent-father, the court could terminate under (c)(*ii*) and (j) only if it considered legally admissible evidence. However, respondent-father concedes that the court could terminate under (c)(*i*) based on "all relevant and material evidence." Respondent-father argues that because there were two different evidentiary standards, the trial court should have held separate hearings. This argument lacks merit.

Respondent-father does not present any persuasive legal authority in support of his argument. Moreover, as discussed above, there was clear and convincing evidence to terminate respondent-father's parental rights under MCL 712A.19b(3)(c)(*i*) and respondent-father concedes that the court could consider all relevant and material evidence in finding grounds under (c)(*i*). Accordingly, because a court need only find one grounds for termination, respondent-father's argument concerning the need for a separate hearing as to (c)(*ii*) and (j) is moot. Respondent-father has not demonstrated a plain error warranting reversal. *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014).

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Respondent-father argues that his counsel during the proceeding rendered ineffective assistance.

When reviewing an ineffective assistance claim in a termination of parental rights case, this Court applies by analogy the principles of ineffective assistance that have been developed in the criminal law context. *In re CR*, 250 Mich App 185, 197-198; 646 NW2d 506 (2001), overruled on other grounds in *In re Sanders*, 495 Mich 394; 852 NW2d 524 (2014). Because respondent-father failed to raise this issue below in an appropriate motion or request for an evidentiary hearing, this Court's review is limited to errors apparent from the record. *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005).

To establish ineffective assistance of counsel, respondent-father must prove: (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that the error was prejudicial. *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 311, 314; 521 NW2d 797 (1994). To establish prejudice, respondent-father must show that there is a reasonable probability of a different result but for counsel's deficient performance. *People v Russell*, 297 Mich App 707, 715-716; 825 NW2d 623 (2012).

Respondent-father contends that counsel was ineffective for failing to call any witnesses at the termination hearing. Decisions regarding whether to call or question witnesses are presumed to be matters of trial strategy and failure to call a witness will constitute ineffective assistance of counsel only if it deprives a respondent of a substantial defense. *Russell*, 297 Mich at 716. In this case, respondent-father did not attend the termination hearing and he does not identity any witnesses whom he believes counsel should have called to testify on his behalf. By failing to identify any witnesses who could have offered favorable testimony, respondent-father has not met his burden of establishing either deficient performance by counsel or resulting prejudice. Moreover, give that respondent father disappeared and did not have any contact with the children or DHHS for over a year, and displayed no ability to overcome the barriers that led to this proceeding, respondent father cannot show how witnesses would have made any difference at the termination hearing. *Id*.

Respondent father also argues that counsel was ineffective for failing to object to the court considering the different statutory grounds for termination at a single hearing. As discussed above, however, this argument would not have made a difference because termination was proper under the lower evidentiary threshold. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Respondent father also argues that counsel's cross-examination of witnesses amounted to ineffective assistance. Specifically, respondent-father maintains that "counsel seems to have purposely elicited testimony that [respondent-father] had continued to use THC rather than having used it once and the later tests simply showing residue." Respondent-father cites the following cross-examination of a caseworker:

> *Q*. You'd indicated [respondent-father] had been participating in drug testing while you were the case worker, correct?
>
> *A*. Correct.
>
> *Q*. I believe there was a collection on April 22nd of 2016; is that correct?
>
> *A*. Correct.
>
> *Q*. Tested positive for THC, did he not?
>
> *A*. Yes.
>
> *Q*. About a week later another drug test, another positive test for THC?
>
> *A*. Yes, correct.
>
> *Q*. About one more week after, that another drug test, another positive test for THC?
>
> *A*. Yes.

*Q*. And on the - - there was a fourth drug test in mid-May and on that drug test he also tested positive for THC, correct?

*A*. Yes, that was May 13th, was his last one.

*Q*. In those four drug tests the amount of THC in his system, which was measured in nanograms per milliliter of blood fluctuated, did it not?

*A*. Yes.

*Q*. Times it would increase and at times decrease, and then re-increase as well?

*A*. Yes.

*Q*. If we look at a chart, do you . . . conclude from that that he was continuing to use throughout the period - - that month long period - - or that it was - - had used previously and the amounts were simply residual from that first use?

*A*. I would conclude that he had continued to use. []

Viewed in context, it is apparent from counsel's questioning that he was attempting to elicit testimony that the fluctuating concentrations of THC shown in the test results was indicative of residual effects rather than continued use. In response, the caseworker offered her opinion that respondent-father was continuing to use marijuana, but she acknowledged that it appeared that he may not be consuming as much marijuana. Given the evidence that respondent father failed drug tests and refused to participate in drug tests, counsel's strategy did not fall below an objective standard of reasonableness. *Pickens*, 446 Mich at 311, 314.

Finally, respondent-father contends that counsel essentially conceded in closing argument that respondents had not done what they needed to, had "moved on," and the court should "move on" as well. Specifically, during closing argument, counsel stated:

I was there. We met with them. They knew what they needed to do. They didn't do it. I thought one of the most apt descriptions I heard today was "move on." They've moved on. And not only in spirit but also literally. And I think the Court should as well.

This argument was deficient on an objective standard of reasonableness. Counsel could have advanced several arguments in support of respondent-father's defense; however, counsel failed to do so and instead appeared to concede his case. This amounted to deficient performance. *Pickens*, 446 Mich at 314. Our next inquiry is whether this deficient argument altered the fact that there existed clear and convincing evidence in the record that the conditions that led to the adjudication continued to exist and there was no reasonable likelihood that respondent-father would rectify the conditions within a reasonable amount of time or that termination was in the children's best interests. The record showed that respondent-father failed to fully comply with any court-ordered requirement or agency recommendation and refused to make contact with DHHS. He abandoned the children for more than a year and had failed to

participate in substance abuse and anger management programs. In addition, his housing situation was unsafe and unsuitable for the children and at the time of the termination hearing, respondent father was not participating with services. Even if counsel had asked for more time to allow respondent-father to comply with services, there is no reasonable likelihood that the request would have been granted considering the length of time the children had been in care and the length of time respondent-father had been inactive with services. *Russell*, 297 Mich at 716. In sum, while counsel's performance with respect to the closing argument was deficient, the deficiency did not affect the outcome of the proceeding and respondent-father is not entitled to a new hearing. *Pickens*, 446 Mich at 314.

Affirmed.


/s/ Jane M. Beckering
/s/ Peter D. O'Connell
/s/ Stephen L. Borrello